UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SHERON HEARST, as Administratrix of the Estate of Byron Hearst, on her own behalf, and on behalf of infant children, BREYANNA HEARST and BRYON HEARST; and SHERON HEARST Individually,

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, and POLICE LIEUTENANT SHAMIK WALTON,

Defendants.
----------------------------------------------------------X

REPORT AND RECOMMENDATION

05 CV 5272 (KAM) (RML)

LEVY, United States Magistrate Judge:

Defendants City of New York (the "City") and New York City Police Department ("N.Y.P.D.")[1] move for summary judgment. By order dated October 12, 2011, the Honorable Kiyo A. Matsumoto, United States District Judge, referred the motion to me for a Report and Recommendation. I heard oral argument on January 5, 2012. (See Transcript of Oral Argument, dated Jan. 5, 2012 ("Tr.").) For the reasons stated below, I respectfully recommend that the City's motion be granted in part and denied in part.

---

[1] Defendants move to dismiss the N.Y.P.D. on the ground that it is not a suable entity. See, e.g., Falcis v. New York City Police Dep't, No. 95 CV 2407, 1997 WL 65798, at *1 (E.D.N.Y. Feb. 10, 1997) (explaining that the N.Y.P.D, as an agency of the City of New York lacking independent legal existence, is a nonsuable entity). Plaintiff does not oppose that motion. I therefore respectfully recommend that the motion be granted.

## BACKGROUND AND UNDISPUTED FACTS[2]

On May 8, 2005, Byron Hearst ("Hearst") was shot and killed during a rent dispute with his landlord, Shamik Walton ("Walton"), a lieutenant with the N.Y.P.D.'s Internal Affairs Bureau ("IAB"), who was off–duty at the time of the shooting. Walton was subsequently indicted on the sole charge of manslaughter in the second degree and was acquitted on April 2, 2007. Subsequently, the N.Y.P.D. conducted a review of the shooting, and both the N.Y.P.D. Firearms Discharge Review Board and the IAB concluded that Walton had not committed any misconduct. On February 13, 2008, all administrative charges against Walton were dismissed, and he was restored to full duty. He is now an active lieutenant with the Brooklyn North Patrol.

Plaintiff Sheron Hearst ("plaintiff"), as administrator of Byron Hearst's estate and on her own behalf, commenced this action on November 9, 2006. She asserts a claim against the City of New York under 42 U.S.C. § 1983, alleging that Walton engaged in acts in his official capacity as a New York City Police Officer and under the color and authority of state law, regulation, custom and usage when he shot Hearst. (See Complaint, filed Nov. 9, 2006 ("Compl."), ¶¶ 21–26.) She also asserts state law claims against the City, as Walton's employer,

---

[2] The following facts, upon which plaintiff's complaint is based, are undisputed or deemed admitted, unless otherwise noted. All parties have served and filed Statements of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a). The rule states that upon any motion for summary judgment, "there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Rule 56.1(b) then requires the party opposing summary judgment to include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Under Rule 56.1(c), all "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless specifically controverted by . . . the statement required to be served by the opposing party." See AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 449–50 (S.D.N.Y. 1998); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 421–23 (S.D.N.Y. 1998); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

for assault and battery, negligence, wrongful death, and loss of spousal services and parental guidance.[3] (See Compl. ¶¶ 5–20, 27–30, 37–39, 40–53.) Plaintiff concedes that the confrontation between Hearst and Walton began as a landord–tenant dispute, but she contends that there are issues of fact as to whether "there was a point in time that the confrontation evolved into a police incident wherein Lt. Walton took official police action." (Plaintiff's Memorandum of Law in Opposition to the City's Motion for Summary Judgment, dated Mar. 17, 2011 ("Pl.'s Mem."), at 1.)

**DISCUSSION**

A. Summary Judgment Standard

A court shall grant summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried. Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact . . . . Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal citations omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant

[3] Plaintiff also named Walton as a defendant, and he and the City have asserted cross-claims against each other. Both plaintiff and Walton have opposed the City's summary judgment motion.

such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, there must be more than "a scintilla of evidence" to support the non-moving party's claims, id. at 251; "assertions that are conclusory" will not suffice, Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). I will address each of plaintiff's claims in turn.

B. 42 U.S.C. § 1983

Section 1983 imposes liability on "any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by any federal law." Cespedes v. Coughlin, 956 F. Supp. 454, 464 (S.D.N.Y. 1997) (quoting Campo v. Keane, 913 F. Supp. 814, 818 (S.D.N.Y. 1996)). Section 1983 creates no substantive rights but merely provides the vehicle whereby federal rights elsewhere or otherwise conferred may be vindicated. Graham v. Conner, 490 U.S. 386, 393–94 (1989). See also Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere"). In order to establish liability under § 1983, a plaintiff must satisfy two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his or her federal statutory rights, or his or her constitutional rights or privileges. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998); Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994) (citations omitted); Rodriguez v. City of New York, 535 F. Supp. 2d 436, 441 (S.D.N.Y. 2008). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with

the authority of state law." Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997) (internal quotations and citations omitted).

However, to state a claim under § 1983 against a municipality, the plaintiff must rely on more than just a theory of respondeat superior. See Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 691 (1978). A municipality may only be held liable under section 1983 where there is a deprivation of rights pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," id. at 690, or where "the contention is not that the actions complained of were taken pursuant to a local policy" but instead that the actions were taken by an official who "had final policymaking authority in the particular area involved," Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). See also Legette– Edwards v. City of Syracuse, No. 06 CV 892, 2007 WL 2891774, at *2 (N.D.N.Y. Sept. 28, 2007) ("There is no respondeat superior liability against a municipality under 42 U.S.C. § 1983 for conduct by employees below the policymaking level.")

Here, plaintiff does not attempt to identify any municipal policy or custom that led to Hearst's shooting. Nor does she allege that Walton was an official with "final policymaking authority." In her opposition brief, plaintiff states that she "does not oppose those portions of the City's motion designated as Point I and Point IV,"[4] which I interpret to mean that she no longer intends to pursue a § 1983 claim against the City. (See Tr. at 12–13 (plaintiff's counsel stating, "We're not saying that as far as a practice of how they're training the police officers and how they've — and how Lieutenant Walton was conducting business on that day was part of a

---

[4] Point I concerns the N.Y.P.D.'s status as a non–suable entity. Point IV is the City's argument regarding Walton's hiring and training and its investigation of the incident. So, clearly, plaintiff is not alleging a failure to train or supervise.

systemic problem imputing that type of federal liability.") I therefore respectfully recommend that plaintiff's § 1983 claim be dismissed.

C. Respondeat Superior Liability under State Law

1. Supplemental Jurisdiction

Because plaintiff does not have a federal claim against the City, the City urges the court to decline to exercise supplemental jurisdiction over her state law respondeat superior claims. However, plaintiff still has federal and state law claims against Walton individually, based on the same set of facts.

Federal courts' exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367, which provides the court with supplemental jurisdiction over "all other claims that are so related to claims in the action . . . within [the federal court's] original jurisdiction that they form part of the same case or controversy. . . . ." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over state law claims where "the District Court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The Supreme Court has explained that district courts should "deal with cases involving [supplemental state law] claims in the manner that best serves the principles of economy, convenience, fairness and comity which underlie the [supplemental] jurisdiction doctrine." City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172–73 (1997).

Here, plaintiff's claims against both the City and Walton "derive from a common nucleus of operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966), namely, the shooting death of Hearst. The state law claims against the City are relatively straightforward and neither predominate over the federal claims nor appear so difficult or

complicated that they ought not be resolved by this court. See Green Hills (USA), L.L.C. v. Aaron Streit, Inc., 361 F. Supp. 2d 81, 88 (E.D.N.Y. 2005). I therefore respectfully recommend that the City's motion to dismiss the state law claims against it under 28 U.S.C. § 1367(c) be denied.

2. Respondeat Superior Under State Law

The City of New York may be held vicariously liable for an intentional tort[5] committed by a police officer under the theory of respondeat superior. Reape v. Berrios, No. 09 CV 1363, 2011 WL 1579080, at *4 (E.D.N.Y. Mar. 29, 2011) (citing Williams v. City of White Plains, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010); Castro v. County of Nassau, 739 F. Supp. 2d 153, 184 (E.D.N.Y. 2010); Webster v. City of New York, 333 F. Supp. 2d 184, 207 (S.D.N.Y. 2004)). A plaintiff invoking the doctrine of respondeat superior has the burden of establishing by a fair preponderance of the credible evidence that the act complained of occurred while the defendant's employee was acting within the scope of his employment with the City of New York. McDowell v. City of New York, 616 N.Y.S.2d 788, 789 (2d Dep't 1994) (citing cases). Under New York law:

> an employer may be held liable based on a theory of respondeat

[5] Plaintiff asserts state–law causes of action for assault and battery, negligence, and wrongful death. (Compl. ¶¶ 5–20, 27–31, 48–53.) It is well–settled that "once intentional offensive conduct has been established, the actor is liable for assault and not negligence." Panzella v. Burns, 565 N.Y.S.2d 194, 195 (2d Dep't 1991); see also Barraza v. Sambade, 622 N.Y.S.2d 964, 965 (2d Dep't 1995) ("[N]o cause of action for negligent assault exists in New York."). As plaintiff's counsel agreed during oral argument that plaintiff is alleging that Walton committed an intentional tort (see Tr. at 25–30), I will interpret plaintiff's complaint as pleading an intentional tort and not a negligence claim.

> superior only where an employee was engaged in the furtherance of the employer's enterprise at the time of the employee's wrongdoing, and the employer was or could have been exercising some control over the employee's activities.

DeVito v. Barrant, No. 03–CV–1927, 2005 WL 2033722, at *7 (E.D.N.Y. Aug. 23, 2005) (citing Longin v. Kelly, 875 F. Supp. 196, 201-02 (S.D.N.Y. 1995)).

That an officer was off–duty when the alleged events occurred is not dispositive of whether the officer was acting within the scope of his or her employment. DeVito, 2005 WL 2033722, at *7 (citing Longin, 875 F. Supp. at 202). It is also not determinative that the officer may have flashed his badge or identified himself as a police officer. See Mahmood v. City of New York, No. 01 Civ. 5899, 2003 WL 21047728, at *2–3 (S.D.N.Y. May 8, 2003); see also Nisbett v. State of New York, 222 N.Y.S.2d 867, 874 (Ct. Cl. 1961) ("Whether [police officer] did or did not so identify himself has no bearing on his status as acting within the scope of his duty."). Nor is it determinative that the officer was authorized to carry an off–duty gun, make off–duty arrests, or use deadly force under necessary circumstances. DeVito, 2005 WL 2033722, at *7 (citing Campos v. City of New York, 759 N.Y.S. 2d 843, 844 (Sup. Ct. N.Y. County 2003) (citing New York criminal procedure laws regarding peace officer duties and stating that "[s]tate law and NYPD regulations, while relevant, do not resolve the vicarious liability issue")); see also Perez v. City of New York, No. 94 Civ. 2061, 1996 WL 103836, at *3 (S.D.N.Y. Mar. 8, 1996) ("[T]he act of identifying oneself as a police officer, producing a shield, and executing an arrest, because one's employment with the City confers the authority to do so, does not automatically create liability for the City."); Stavitz v. City of New York, 471 N.Y.S.2d 272, 274 (1st Dep't 1984) ("There was no automatic liability attaching to the City when defendant . . . produced his

shield and arrested plaintiffs, simply because his employment as a police officer by the City conferred upon him the authority to make arrests.").

While some off–duty actions may be considered within the scope of an officer's employment, where the officer's actions are "brought on by a matter wholly personal in nature, the nature of which is not job–related, his actions cannot be said to fall within the scope of his employment." Longin, 875 F. Supp. at 202 (quoting Stavitz, 471 N.Y.S.2d at 274); see also DeVito, 2005 WL 2033722, at *7 (explaining that the inquiry is whether the officer's actions "stemmed from [an] incident[] where [he or she] may have been authorized to act in virtue of [his or her] status as [a] peace officer[]" or from "matter[s] wholly personal in nature.") The officer's "subjective characterization of the incident," by itself, "is not dispositive of the issue of whether he acted within the scope of his employment." Longin, 875 F. Supp. at 203; see also Johnson v. City of New York, 702 N.Y.S.2d 636, 636–37 (2d Dep't 2000) ("[Defendant's] testimony that he employed his police training and that he believed that he was acting as a police officer, is conclusory.").

Here, it is undisputed that Walton was a landlord who rented an apartment at 645 Macon Street[6] to Hearst and his girlfriend, Oralee Henderson. (City's 56.1 ¶ 11.) At the time of the shooting, Hearst had been Walton's tenant for one year. (Id. ¶ 14.) Walton never informed the N.Y.P.D. that he was a landlord or sought approval to engage in that occupation off–duty. (Id. ¶ 17.) Nor did Walton inform Hearst or any of his tenants that he was a police lieutenant. (Id. ¶14.)

---

6 Walton and his wife inherited the two–family brownstone at 645 Macon St. from Walton's mother–in–law approximately one year before the incident. (City's 56.1 ¶ 5.)

When Hearst failed to pay his rent for the month of April 2005, Walton retained private counsel to commence eviction proceedings against Hearst. (Id. ¶ 45). The shooting occurred on Sunday, May 8, 2005, which was Walton's regular day off from his job with the N.Y.P.D. (Id. ¶¶ 52–53). On that date, Walton and his wife were driving in their personal vehicle to the Botanic Garden when they stopped at 645 Macon Street to pick up the rent from Hearst. (Id. ¶ 54). An altercation ensued, during which Walton shot Hearst, allegedly in self–defense. He then retreated to his car and called 911. (Id. ¶ 90.)

Plaintiff contends that there is a factual dispute as to whether Walton was acting in the scope of his employment when he shot Hearst. The record evidence is as follows:

● Walton testified in his deposition that he did not go to 645 Macon Street on May 8, 2005 in furtherance of police business, but as a private citizen to collect rent from his tenant. (City's 56.1 ¶¶ 56-57 (citing Deposition of Shamik Walton ("Walton Dep.") at 190:20-191:7, annexed as Ex. C to the Declaration of Tonya Jenerette, Esq., dated Dec. 17, 2011 ("Jenerette Decl.").)

● Walton carried his N.Y.P.D. police shield and his .38 caliber off–duty service revolver, in compliance with N.Y.P.D. requirements, but both were concealed from public view. (City's 56.1 ¶¶ 58-59 (citing Walton Dep. at 25:9–25 and 105:15–23, annexed as Exs. C & I to the Jenerette Decl.).)

● In his criminal trial, Walton testified that Hearst had violently attacked him, and that it was only after Hearst had hit him and Walton was on the ground in a "prone position" that Walton pulled his firearm and said, "Stop. I'm a cop." (City's 56.1 ¶¶ 84–85; Walton Dep. at 451, annexed as Ex. C to the Jenerette Decl.) Walton testified that he did not display his shield

or tell Hearst that he was under arrest. (City's 56.1 ¶¶ 87–88.) According to Walton's testimony, Hearst continued to charge at Walton and attempted to grab his weapon. Walton discharged the firearm three times. (Id. ¶¶ 98, 100.)

● When Walton first arrived on the scene, Hearst was standing outside the building talking with Gleason Lewis, who was one of the only witnesses to the incident. At the criminal trial, Lewis testified that he did not hear Walton identify himself as a police officer. (City's 56.1 ¶¶ 60, 86.)

● Walton testified that, immediately after the shooting, Hearst exclaimed "you shot me" and ran into his apartment. (Id. ¶¶ 102–03 (quoting Walton Criminal Trial Testimony, annexed as Ex. B to the Jenerette Decl., at 459).) Walton then retreated to his car and called 911 while driving to the 81st Precinct. He did not give his name or shield number to the 911 dispatcher, or make an "officer in need of assistance" call, but simply identified himself as a member of the service. (Tr. at 7.) Walton told the 911 dispatcher that he "went to see his tenant, got into a dispute," and "had to discharge" his firearm. (Jenerette Decl., Exs. J & K.) When he arrived at the precinct, he stated that he had been involved in a shooting and relinquished his shield and firearm. (City's 56.1 ¶¶ 108, 112.) At that point, Walton was placed on modified duty and ordered to remain in the station house "in order to facilitate the investigation into the shooting." (Reply Memorandum of Law in Support of the City's Motion for Summary Judgment, dated May 13, 2011 ("City's Reply Mem."), at 7.)

● Deputy Chief Thomas Mason responded to the scene of this incident approximately an hour and a half after the shooting. He later supervised the IAB's investigation of the shooting. At his deposition, Mason testified that he considered the shooting a "police

incident" because Walton is "a police officer that was involved in an incident," meaning the discharge of his firearm, and that he believed Walton had been "attempting to place [Hearst] into custody for assaulting him." (Deposition of Thomas Mason, annexed as Ex. B to the Declaration of Richard M. Levy, Esq., dated Mar. 17, 2011 ("Levy Decl."), at 79.) According to the City, it is "standard practice for the NYPD Firearms Discharge Review Board and the Internal Affairs Bureau to conduct an investigation whenever a police officer discharges his firearm, irrespective of whether he does so during a personal dispute or while on duty." (City Reply Mem. at 5 (citing Jenerette Decl., Exs. I & M); see also Tr. at 32.)

- Walton applied for and received overtime pay for the time period during which the shooting occurred. (See Overtime Pay Reports, annexed as Ex. A to the Levy Decl.) The City maintains that this was because he was placed on modified duty, so that he could not leave the station house during the investigation. The Corporation Counsel's office later informed Walton that it would not represent or indemnify him because the shooting occurred during a purely personal dispute.

Construing this evidence in the light most favorable to the plaintiff, as this court must, I find that there are questions of material fact as to whether Walton was acting in the scope of his employment when he shot Hearst, and therefore whether the City can be held liable under a theory of respondeat superior for his acts. While it is undeniable that the altercation between Walton and Hearst began as a personal dispute, courts have held that an off–duty conflict can develop into police action, and that whether it did so in a particular case is usually a question of fact. See, e.g., DeVito, 2005 WL 2033722, at *7 (finding question of fact as to whether corrections officer was acting within the scope of his employment when he shot person who

allegedly had robbed his car, slashed his face, and attempted to flee); Medley v. City of New York, No. 94–CV–3708, 1998 WL 938731 (E.D.N.Y. Dec. 3, 1998) (denying summary judgment as to the City of New York where two off–duty police officers working as security guards for a housing complex, in violation of N.Y.P.D. policy, entered into an argument with a man who was blocking traffic); Perez, 1996 WL 103836, at *4 (explaining that the court will not dismiss claims against the City "whenever an arrest and prosecution are made by an off–duty corrections officer after an event which gives the officer a personal motive to press charges" and that "a jury [must] determine whether the officer was acting within the scope of his employment[.]"); Frazier v. State of New York, 476 N.E.2d 318, 319 (N.Y. 1985) (finding questions of fact which required a trial to determine respondeat superior liability where off–duty corrections officer, who was pursuing two men who had allegedly robbed him, fired shots and injured a bystander); De Jesus v. New York City Transit Auth., 618 N.Y.S.2d 806, 807 (1st Dep't 1994) (affirming denial of summary judgment because an issue of fact existed as to whether off–duty Transit Authority police officer who was riding as a passenger in plaintiff's car when it was rammed by another vehicle was acting within the scope of his employment in apprehending the other driver).[7] I

---

[7] There have been cases where it was undisputed that the officer was the initial aggressor in an off–duty altercation, and the courts have concluded that there was no municipal liability as a matter of law because the off–duty officer was engaging in acts that were "wholly personal in nature." See, e.g., Turk v. McCarthy, 661 F. Supp. 1526, 1536 (E.D.N.Y. 1987) (City not liable when a drunk off–duty police officer shot a security guard who asked him to leave the grounds of an amusement park); Davis v. City of New York, 641 N.Y.S.2d 275, 276 (1st Dep't 1996) (off–duty corrections officer who became angry and shot plaintiff, who allegedly cut in front of him in a McDonald's restaurant line, was not acting within the scope of his employment); Fuller v. City of Yonkers, 474 N.Y.S.2d 813, 813 (2d Dep't 1984) (municipality not liable when off–duty police officer fatally shot a bar employee during an attempt to remove his daughter from a bar); Stavitz v. City of New York, 471 N.Y.S.2d 272, 272 (1st Dep't 1984) (off–duty police officer's actions were personal in nature when he assaulted and arrested a neighbor over a

(continued...)

therefore respectfully recommend that the City's motion for summary judgment be denied on this claim.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that plaintiff's claim against the City of New York under 42 U.S.C. § 1983 be dismissed and that plaintiff's motion for summary judgment be denied with respect to plaintiff's supplemental claims against the City under New York State law. I further recommend that the New York City Police Department be dismissed as a defendant.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Matsumoto and to my chambers, within fourteen (14) days. Failure to file objections within the specified time waives the right to review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Respectfully submitted,

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
February 17, 2012

[7](...continued)
disagreement regarding their common driveway). These cases are inapposite here, where the off–duty officer claims to have acted in self–defense in the face of what the City characterizes as a violent assault against him by a "belligerent" and "crazed" individual. (Tr. at 3, 34.)